Filed 10/30/25  In re P.P. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re P.P., a Person Coming Under the Juvenile Court Law. | |
| CONTRA COSTA CHILDREN AND FAMILY SERVICES BUREAU,<br><br>      Plaintiff and Respondent,<br><br>v.<br>K.P.,<br><br>      Defendant and Appellant;<br><br>J.C.,<br><br>      Objector and Appellant. | A172621<br><br>(Contra Costa County Super. Ct. No. J23-00459) |

This is our second opinion in this dependency proceeding involving P.P. (born November 2022), the daughter of K.P. (mother) and J.C. (father).  The juvenile court terminated reunification services and set a permanency planning hearing under section 366.26 of the Welfare and Institutions Code. In our first opinion, we denied mother's and father's writ petitions

challenging that order.[1]  The juvenile court then terminated mother's and father's parental rights under section 366.26.  Both parents now separately appeal, claiming the court erred by concluding they did not establish the parental-benefit exception to termination under section 366.26, subdivision (c)(1)(B)(i).  We affirm.

## I.  BACKGROUND

### A.  Initial Proceedings

In August 2023, the Contra Costa County Children & Family Services Bureau (Bureau) filed a juvenile dependency petition "alleging that P.P. was described by subdivision (b)(1) of section 300 due to mother repeatedly leaving the infant minor unattended for extended periods, using marijuana, and failing to comply with mental health treatment."  "Mother's behavior was described as angry, aggressive, abusive, and manipulative."

At the detention hearing, the juvenile court "formally detained [P.P] in foster care" and "raised [J.C.] to presumed father status."  The court ordered supervised visitation for mother and visitation for father to be "supervised at the Bureau's discretion."  "[M]other and father each filed a waiver of rights and jurisdiction was established based on slightly revised petition language."

### B.  Reunification Period

"In advance of the dispositional hearing, the Bureau filed a report recommending reunification services for both parents."  At that time, "mother did not have a safe and stable place to stay.  She had engaged in therapy and enrolled in a parenting class.  She admitted to smoking marijuana

[1] Undesignated statutory references are to the Welfare and Institutions Code.  Quoted portions from the factual background come from our prior opinion, *J.C. v. Superior Court of Contra Costa County* (Feb. 10, 2025, No. A171654) [nonpub. opn.].  We take judicial notice of the record in that appeal.  (Evid. Code, §§ 452, 459.)

2

approximately twice a week to help her anxiety. Father was living in a studio apartment, but, upon inspection, the home was not in a state where the minor could spend time there. He was employed full time and identified some family and friends who might help him care for P.P. He declined to share his strengths or needs because he considered himself nonoffending and believed he should have immediate custody of his daughter." "P.P. had been very behind developmentally when she entered foster care." But "[a]fter two months in foster care, [she] could roll over, crawl, pull herself to a stand, hold food, and self-feed. She was babbling and smiling and had adjusted well to daycare."

At the dispositional hearing in November 2023, "the juvenile court declared the minor to be a juvenile court dependent and ordered reunification services for both parents. Mother was ordered to complete a psychological evaluation and comply with treatment; participate in random drug testing; and attend parenting classes. Father was required to complete a psychological evaluation and attend parenting classes. Visitation for mother and father was ordered a minimum of eight hours four times per month, to be supervised at the Bureau's discretion."

Later that month, "the court suspended mother's visitation with the minor until she complied with mental health treatment. The Bureau requested the change due to mother's escalating erratic and dangerous behaviors. For example, mother sent a series of e-mails to father, calling him names and threatening him. . . . In addition, mother stated father had hired a hit man to kill her and P.P. in the past. Mother threatened to sue the social worker for lying in reports and, at one point, walked aggressively toward the social worker while the worker was holding another foster child, yelling and recording the interaction. On another occasion, mother carried the minor

3

into the lobby after a visit and recorded with her other hand while she screamed and cursed at the foster parent and accused the foster father of raping P.P. She set the minor down and took off her diaper to show everyone in the lobby that P.P. was being raped. P.P. was crying the whole time and falling out of mother's arm." In February 2024, "the juvenile court appointed a guardian ad litem for mother and reinstated supervised visitation for her once per week for one hour."

"In its report for the six-month review hearing, the Bureau recommended that reunification services be terminated for both parents. Mother was reportedly living in an RV (recreational vehicle) in an undisclosed location but was open to moving to a shelter. She was a full-time college student majoring in child development and hoping to find a job working with children. During the reporting period, the social worker repeatedly had to redirect mother away from focusing on father or on efforts outside of her case plan. Mother continued to contact father, telling him to stop showing up for court, stating that he was stalking her, and threatening that she would have him arrested. In March, mother punched the maternal grandmother repeatedly in the head while she was driving and told her she would kill her if she lost her baby. Battery charges were filed."

"Mother was seeing a psychiatrist, had been diagnosed with adjustment disorder with anxiety, and was taking prescribed medication that she found helpful. Mother also reported benefitting from seeing a therapist. She had completed her parenting class. Mother had a number of no shows for her drug testing, otherwise testing positive only for marijuana. Despite her participation in services, mother had not shown the behavior changes needed to be able to safely parent P.P., and her mental state was still unstable. Although she had 'unwavering love' for P.P., mother could not consistently

4

acknowledge that she had put the minor in an unsafe situation by leaving her alone."

"Father continued to work full time but was unhoused and living in his car. He refused to sign his case plan, reiterating that he was the nonoffending parent. When mother charged at father after a court hearing in February, yelling and alleging the foster parents were raping P.P., the court worker suggested father obtain a restraining order with the help of the Bureau's domestic violence liaison, but he had not done so. He declined to participate in any services, stating he would play '*the long game*' and reunify with his daughter '*another way*.' "

Following a "contested six-month review hearing" in June and July 2024, the juvenile court "continued reunification services to the 12-month mark." "[T]he Bureau again recommended that reunification services be terminated for both parents. Mother had entered a homeless shelter . . . and was invited to participate in a 90-day program of classes, including anger management, to [explore] the shelter's yearlong Life Transformation Program." But she "only participated for one month," citing "employment reasons." "Although she could have reunified with P.P. in the Life Transformation Program and was urged to reconsider, mother was reluctant because she would not have her cell phone for a period of days and was worried she would not be able to visit or do services. The social worker explained that she would still be able to continue her case plan with her current providers. Nevertheless, mother refused to enter the program without P.P." "Mother stated she was medication compliant but the social worker's attempts to confirm this were not successful. Mother continued to do well in therapy and noted a reduction in anger and anxiety. Although she still had several no shows, she was testing negative for all substances since

May 2024. She was able to articulate a basic plan of age-appropriate foods and activities for P.P."

"Father was still living in his vehicle." "He continued to state he did not want to work with the Bureau, and, despite numerous attempts by the social worker, the two had no contact after June. He continued to decline participation in services, stating he did not trust the Bureau. Both parents were consistent in their twice weekly visitation, although father still had issues reading P.P.'s cues, and the minor still showed some reticence in engaging with father."

"A contested 12-month review hearing was held over several days in October and November 2024. [Fn. omitted.] While the hearing was pending, mother raised concerns that P.P. was being sexually abused in foster care, as she had at the beginning of the case. Mother was observed excessively cleaning the minor during diaper changes to the extent that P.P. would say ' "ow" ' and try to lock her legs. These behaviors were not observed with other care providers and were one of the reasons mother's visits remained closely supervised. The social worker believed it was in the minor's best interest to reduce mother's visitation at this point."

"Mother had left the shelter and would not share her location with the social worker. The social worker tried to assist mother in entering another program, especially since she was pregnant again, but mother continued to state she could not afford it despite the worker telling her repeatedly how she could access the necessary funds through general assistance." A new psychiatrist had diagnosed mother "with PTSD and major depressive disorder (in remission) as well as generalized anxiety. Mother was still struggling with her anxiety, but was using tools she had learned to help manage it. The social worker testified that, though there were still moments

6

of concern, mother's behavior had improved and was less unpredictable than it had been at the beginning of the dependency."

"While the hearing was ongoing, father finally contacted the social worker, explaining he did not make himself available sooner because he was upset about a portion of the social worker's previous court testimony. . . . Father indicated wanting to have P.P. with him but presented no plan for caring for her. The social worker was concerned about father refusing to take a parenting class as he would misread the minor's cues during visits. . . . The case plan requirement for a psychological evaluation stemmed from Bureau concerns regarding father's perceived paranoia regarding both the Bureau and mother. However, the real problem for the social worker was not lack of compliance with his case plan or father's living situation but rather the fact that she had not been able to fully assess his ability to safely parent P.P. She was also concerned that father would not cooperate with the Bureau if P.P. was placed with him so that it could monitor the minor."

"At the conclusion of the hearing, the court terminated reunification services and set the matter for a permanency planning hearing pursuant to section 366.26 . . . . In doing so, the court concluded there would be a substantial risk of detriment to P.P. if she was placed with either parent, noting that both parents had declined to provide the social worker with information about their current living situations and neither had demonstrated the protective capacity necessary to be granted custody of the minor." "With respect to a substantial probability of return by the 18-month mark, the court found that both parents had consistent and regular contact with P.P. However, neither parent had shown 'at all' that they had made significant progress in resolving the problems that led to the dependency. With respect to being able to complete the case plan objectives if granted

7

additional time, while mother had worked hard on her case plan, there was 'no indication' this had translated into the required behavioral changes. And father made clear he was not willing to do anything but visit."

"Although the court adopted the Bureau's recommendation to terminate reunification efforts, it found the Bureau's request to reduce visits to once per month 'too drastic.' The court recognized that the case had shifted to focus on the minor's interests rather than the parents' but adopted the suggestion of minor's counsel for visitation twice a month for two hours. A permanency planning hearing was set for February 2025."

This court denied mother's and father's separate writ petitions challenging the juvenile court's order.

## C. *Subsequent Proceedings*

At the permanency planning hearing, the Bureau relied on its report recommending that the juvenile court terminate the parental rights of both mother and father. The report noted that P.P. "continue[d] to make great progress on her developmental milestones" while in foster care, was "doing great" in day care, had "not shown any emotional instability," and received negative results from a mental health screening. Both parents consistently completed supervised visits: mother completed 60 of 70 visits offered and allowed the maternal grandmother to join at least one visit per month, and father completed 96 of 105 visits offered. The report noted that mother's visits were suspended from mid-November 2023 until mid-February 2024. During visits, "the parents still require[d] prompting when engaging with [P.P.] in age-appropriate ways and reading her queues." P.P. had "an easier time transitioning to" mother than father but "engage[d] with both of her parents." Still, she "continue[d] to need the support and guidance of" the

8

visitation supervisor, suggesting she "view[ed] her parents as friendly strangers."

After mother's visits resumed, P.P. "show[ed] a bigger response to seeing [her] at the beginning of the visit due to recognizing her." Mother could remain focused on P.P. "for the most part" and could usually leave worries or anxieties " 'outside of the visit' " as instructed. At times, "a particular event that ha[d] been triggering for" mother could "enter the visit," and mother would "ask for the social worker or their supervisor." During two visits, mother was "on the telephone for nearly half of the visit." "However, during most of the visits," mother was "appropriate with [P.P.] and follow[ed] her lead." "During all visits, [mother] was able to take any reminders/direction" from the visitation supervisor without issue.

Mother brought "grooming items such as lotions or oils to put on [P.P.]," would "play nursery rhymes or gospel music for" her, and once "brought a Biblical Pamphlet and read it to [P.P.,] telling her the importance of Baptism." P.P. "enjoy[ed] role playing with baby dolls and kitchen toys during the visits," and mother also allowed her "to watch movies/ shows and music videos." P.P. was "clear with [mother] about what she want[ed]." Although P.P. and mother "generally engage[d] well with one another," mother did "not notice when [P.P.] ha[d] transitioned in play." For example, mother once told P.P. she would "go in 'time out' too" after P.P. "refused to dance" to a song mother played on her phone.

As father's visits progressed, P.P. would "allow[] him to get near her, hold her and play with her." Father would "play blues music for" P.P. and allow her "to explore her surroundings with minimal intervention." He would "intervene if she place[d] things in her mouth," offer her "bottles and snacks," and change her diaper if she was soiled. P.P. was "not always hungry and

9

[would] not take to the bottle or snacks well." Father was "an avid fisherman" and once brought "a worm" that P.P. held during the visit. Father was "completely focused" on P.P. and would "not answer his phone" if it rang during a visit. On a couple of occasions, he would say " 'No!' " and redirect P.P. to bite on his finger "instead of allowing [her] to play with a toy that [wa]s safe to chew on." Once, father was "a bit resistant to the direction of" the visitation supervisor, and P.P. would "still seek out" the supervisor during visits. P.P. would say " 'No' " when father would "try to engage with [her] or do her hair." Once, when P.P. was telling father " 'No' as he tried to approach her," she "attempt[ed] to swing at" or hit father. Instead of redirecting her, father "move[d] around [her] swings." Another time, father placed P.P. on his shoulders and she "started to cry and appeared scared." Father "reassured [P.P.] that he had her" and "questioned why she was scared."

The report concluded that P.P. was "adoptable" and had no "apparent medical issues or developmental delays." Her foster parents had been married for eleven years, lived in a three-bedroom home in "a quiet, family-oriented neighborhood," and were committed to providing P.P. with a permanent home. P.P. was comfortable in her foster parents' care, and she identified them as " 'Mom' and 'Dad.' " She had "a loving and playful relationship" with their eight-year-old daughter. The foster parents were not interested in legal guardianship. The report recommended that any future visitation between P.P. and her birth parents be at the discretion of the adopting parents.

Father did not testify or present any other evidence at the hearing. Mother testified that her visits with P.P. "went well," and P.P. would "run to [her] and tell [her] she loves [her]." She described activities that P.P. enjoyed

10

during the visits. Mother testified that P.P. "loves to call [her] Mommy."
After this testimony, mother made an oral motion under section 388, on the
grounds that her circumstances had changed and she was now capable of
caring for P.P. Mother provided additional testimony to support that motion,
which the juvenile court denied.[2]

## D. *The Juvenile Court's Ruling Terminating Parental Rights*

The juvenile court explained that, unless an exception was established,
it need only find by clear and convincing evidence that P.P. would be adopted
and find that reunification services had previously been terminated to
terminate parental rights. The court made these findings. It explained that
the parental-benefit or "parental bond exception" was the only potentially
applicable exception in P.P.'s case, and there were three prongs that must be
established for that exception to apply.

"[E]veryone agree[d]" that the first prong of regular visitation was
established, and the juvenile court found that prong satisfied. Moving to the
next prong, the court analyzed whether P.P. had a "substantial, positive
emotional attachment" to her parents. The court observed that "[f]rom the
beginning, it has been very clear that the parents love [P.P.] very much, and
so the connection in that direction has always been clear." But the court
emphasized that for the exception to apply, "the substantial, positive
emotional attachment has to go from child to parent." Among the relevant
factors were "whether there was an existing bond prior to removal, and the
conditions in the removal detention reports . . . as they reflect on the current
bond." The court explained that P.P. was only eight months old when she

---

[2] Since mother does not appeal that ruling, we need not further discuss
those proceedings. Still, we have reviewed and considered mother's
additional testimony.

11

was removed from mother's care and had never been in father's care: "Given that she was so young, she never had time to establish a significant bond outside of the visitation room with her parents." While visits recently had been "relatively positive," their quality ebbed and flowed over the course of the action, and there had been some interactions that "inhibit[ed], to some degree, establishment of a bond," "more so with . . . mom's visits than with dad's." Ultimately, the court concluded that "as reflected in this past report, there is not sufficient evidence of a substantial, positive emotional attachment from child to parent." The court also found that under the third prong, there was "not sufficient evidence to suggest that termination of parental rights would be detrimental, such that it would outweigh the benefits of the stability that an adoptive home would bring."

At the end of the hearing, the juvenile court again told mother it could "see how sincere you are in your love for [P.P.]," heard additional comments from mother, and noted that she had the right to appeal.

## II.  DISCUSSION

### A.  *Governing Legal Principles*

The purpose of the section 366.26 hearing is to select and implement a permanent plan for the child. (*In re Caden C.* (2021) 11 Cal.5th 614, 630 (*Caden C*).) "[I]f the court finds that the child is likely to be adopted and that 'there has been a previous determination that reunification services be terminated, then the court shall terminate parental rights to allow for adoption. [Citation.] But if the parent shows that termination would be detrimental to the child for at least one specifically enumerated reason, the court should decline to terminate parental rights and select another permanent plan.' (*Caden C.*, *supra*, 11 Cal.5th at pp. 630–631 [citation]; see § 366.26, subd. (c)(1)(B)(i)-(vi), (4)(A).)" (*In re M.V.* (2025) 109 Cal.App.5th

486, 507 (*M.V.*).)  One of those exceptions is the parental-benefit exception. (*Ibid.*)

The proponent of the parental-benefit exception must establish, by a preponderance of the evidence, three elements: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Caden C., supra*, 11 Cal.5th at p. 631, italics omitted.)

" 'The first element . . . is straightforward.  The question is . . . whether "parents visit consistently," taking into account "the extent permitted by court orders." ' "  (*In re Katherine J.* (2022) 75 Cal.App.5th 303, 316 (*Katherine J.*), quoting *Caden C., supra*, 11 Cal.5th at p. 632.)

"To establish the second element, . . . the parent must show the child has a 'substantial, positive, emotional attachment to the parent—the kind of attachment implying that the child would benefit from continuing the relationship.' "  (*M.V., supra,* 109 Cal.App.5th at p. 507, quoting *Caden C., supra*, 11 Cal.5th at p. 636.)  "The 'focus is the child,' " *id.* at p. 508, and the court considers "a slew of factors, such as '[t]he age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs,' " *Caden C., supra*, 11 Cal.5th at p. 632, quoting *In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.  In assessing this element, "courts often consider how children feel about, interact with, look to, or talk about their parents." (*Caden C., supra*, 11 Cal.5th at p. 632.)

Finally, per the third element, courts must determine "how the child would be affected by losing the parental relationship — in effect, what life would be like for the child in an adoptive home without the parent in the child's life."  (*Caden C., supra*, 11 Cal.5th at p. 633.)  "That subtle, case-

13

specific inquiry" asks whether "the benefit of placement in a new, adoptive home outweigh[s] 'the harm [the child] would experience from the loss of [a] significant, positive, emotional relationship' " with the parent. (*Ibid.*) " 'When the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss,' " the parental-benefit exception applies. (*M.V., supra,* 109 Cal.App.5th at p. 508.)

*Caden C.* "establishes a hybrid standard of review" for the parental-benefit exception. (*Katherine J.*, *supra,* 75 Cal.App.5th at p. 317.) "The first two elements, which require the juvenile court to 'make a series of factual determinations' regarding visitation and the parent-child relationship, 'are properly reviewed for substantial evidence.' " (*Ibid.*) " '[T]he ultimate decision—whether termination of parental rights would be detrimental to the child due to the child's relationship with his [or her] parent—is discretionary and properly reviewed for abuse of discretion.' " (*Id.* at p. 318.)

## B. Determination as to Mother

The juvenile court's determination that P.P. did not have a substantial, positive attachment to mother is well-supported. The court appropriately considered P.P.'s youth, the little time she spent in mother's custody, and the inconsistent quality of her visits with mother due to "some of the behaviors that were presented in mom's visits." While generally acknowledging that visits were "fairly positive" and there was "a connection from the parents to the child," the court concluded there was insufficient evidence of a substantial attachment "from child to parent." Throughout their history of visits, P.P.'s continuing "need [for] the support and guidance of" the visitation supervisor suggested to the Bureau that P.P. "view[ed] her parents as friendly strangers." This evidence and inference went unchallenged at the permanency hearing. The fact that P.P. enjoyed visits with mother and the

two "showed affection for each other" did not require the court to find a substantial attachment, particularly where the record provided no indication that P.P. experienced any distress when visits ended or even when visitation was suspended for a period of time. (*In re I.E.* (2023) 91 Cal.App.5th 683, 692–693 [meaningful, affectionate visits and child's expressions of concern for mother did not compel a finding of substantial, positive attachment]; see also *Katherine J.*, *supra,* 75 Cal.App.5th at pp. 318–322 ["pleasant visits" and "warm and loving relationship" did not compel a finding of substantial, positive attachment, particularly where parent's substance abuse and violence issues compromised the relationship].) Given its amply supported finding that P.P. lacked a substantial, positive attachment to mother, the court did not abuse its discretion in concluding the benefits of adoption would outweigh any detriment from terminating mother's parental rights.

Mother urges that P.P.'s young age and brief time in her custody do not preclude an attachment sufficient to establish the parental-benefit exception, citing *In re M.G.* (2022) 80 Cal.App.5th 836. But in that case, both the juvenile court and the court-appointed expert focused on the parents' abilities as caregivers to the disabled minor, not the quality of the minor's emotional attachment to his parents. (*Id.* at pp. 845, 849–851 [court noted parents " 'have not acted in a parental role' "; expert focused on "concerns about [minor]'s other, nonemotional issues"].) Here, the court appropriately focused on P.P.'s emotional attachment to mother, not mother's ability to parent her. While the court considered mother's "struggles" insofar as they impacted the elements of the exception, this was entirely proper. (*Caden C.*, *supra,* 11 Cal.5th at p. 639.)

Mother also seems to argue that it was improper for the juvenile court to weigh the detriment of terminating parental rights against the benefits of

15

adoption, and that a plan of legal guardianship would benefit P.P. more than adoption. But our Supreme Court has explained that the court's role *is* to "decide[] whether the harm of severing the [parental] relationship outweighs 'the security and the sense of belonging a new family would confer' " through adoption. (*Caden C., supra*, 11 Cal.5th at p. 633.) Section 366.26, subdivision (b) establishes the preference for adoption over guardianship. "If adoption is likely, the court is *required* to terminate parental rights," unless the parental-benefit or other specified exception "compel[s] a finding that termination would be detrimental to the child." *(In re S.B.* (2009) 46 Cal.4th 529, 532, italics added; see also § 366.26, subd. (c).) The court correctly applied these legal principles.

Like the juvenile court, we recognize mother's sincere love for P.P. and her efforts to complete her case plan. But as the court emphasized, in analyzing the parental-benefit exception, "the focus is on the best interests of the child." (*Caden C., supra,* 11 Cal.5th at p. 632.) We find no fault with the court's performance of this "difficult task in making th[e] important decision" to terminate parental rights to allow for P.P.'s adoption. (*Id.* at p. 625.)

## C. *Determination as to Father*

The juvenile court's termination of father's parental rights is also well-supported. Like mother, father presented no evidence P.P. was unhappy or showed distress when visits ended. And while P.P. grew more comfortable with their visits over time, there was little evidence she felt an attachment to father, let alone a substantial, positive attachment sufficient to establish the parental-benefit exception. The court's finding that there was no such attachment is supported by substantial evidence, and the court was well within its discretion to determine that the benefits of adoption would outweigh any detriment from terminating father's parental rights.

16

Father contends his consistent visits with P.P. were "predominantly positive." But even accepting that characterization, this is not enough to show P.P. experienced a substantial, positive attachment to father, as we have explained. Father reasserts that he was not an offending parent in an effort to defend his unwillingness to participate in services. But as father himself acknowledges, the decision to terminate parental rights is focused on the child's relationship with the parent, not whether the parent's actions were justified or understandable.

On appeal, father also relies on general statements about the importance of a "natural parent-child relationship." However, what is required to establish the parental-benefit exception is evidence of an actual, substantial, positive attachment from the child to the parent. Father's conclusory argument that his relationship with P.P. was "important" to her does not suffice. (See *In re Andrew M.* (2024) 102 Cal.App.5th 803, 818 [parents must prove something more than *some* benefit from a relationship during visits "to depart from the statutory preference for adoption"; it is only " '[w]hen the relationship with a parent is so important to the child that the security and stability of a new home wouldn't outweigh its loss, [that] termination would be "detrimental to the child due to" the child's beneficial relationship with a parent' "].) Here, the circumstances do not support a conclusion that father's relationship with P.P. was "so important" as to outweigh the benefits of adoption. (*Id.* at p. 820.)

### III. DISPOSITION

The juvenile court's order terminating parental rights and declaring adoption to be the permanent plan for P.P. is affirmed.

17

_____

Smiley, J.

WE CONCUR:

_____

Humes, P. J.

_____

Langhorne Wilson, J.

*In re P.P.* A172621